# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

### CASE NO. _____

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

GOLIATH VENTURES INC., and
CHRISTOPHER A. DELGADO,

      Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### I.     INTRODUCTION

1. The Commission brings this action against Defendants Goliath Ventures Inc. ("Goliath") and its founder and Chief Executive Officer Christopher A. Delgado ("Delgado") (collectively, the "Defendants") to enjoin them from committing further violations of the antifraud and securities registration provisions of the federal securities laws. Goliath purported to be an international firm specializing in blockchain technology, crypto asset-liquidity pools, and Bitcoin mining infrastructure. From at least January 2023 through January 2026 (the "Relevant Period"), Defendants operated a Ponzi scheme, raising at least $425

million from over 1,300 investors, primarily in the United States, through an unregistered offering of securities in the form of "Joint Venture Agreements" ("JV Agreements") in which investors "partner[ed]" with Goliath to invest in purported crypto asset-liquidity pools managed by Goliath ("Liquidity Pools"). [1]

2.      Defendants told investors that Goliath would invest their money—which Goliath would use to purchase crypto assets—or their crypto assets (collectively, "Funds") into Liquidity Pools. In return, Defendants promised monthly profit distributions of 3% to 10% generated from fees buyers and sellers paid to trade crypto assets within the Liquidity Pools. They also guaranteed the return of investors' principal.

3.      Contrary to their representations, Defendants did not invest any Funds into any Liquidity Pools. As such, they generated no profits and failed to return investors' principal.

4.      Instead, Delgado misappropriated at least $51 million of investor money for personal use, including purchasing homes, luxury vehicles, a yacht, and travel.

---

[1] A liquidity pool is a smart contract that serves as an automated market maker, holding balances of two unique crypto assets that are deposited by crypto asset holders who are called liquidity providers. Liquidity pools allow buyers and sellers to trade against these pooled crypto assets on decentralized trading platforms, a type of "DeFi" platform. Liquidity providers receive a percentage of the fees that buyers and sellers pay for using the liquidity pool to trade crypto assets. Trades conducted through liquidity pools are executed automatically and formulas adjust the price of assets in the pool based on supply and demand.

5. Defendants also used Funds from new and existing investors to pay promised returns to earlier investors in classic Ponzi scheme fashion. When the inflow of new investor Funds slowed, Defendants offered investors excuses for the delayed payments. All the while, Defendants were hiring sales agents to recruit additional investors and compensating those agents with commissions paid with investor Funds. Delgado managed the team of sales agents, directed their solicitation efforts, and personally solicited investors by providing them with marketing materials and the JV Agreements, which he countersigned on Goliath's behalf.

6. Defendants also fabricated account balance and investment performance metrics to make it appear that investors were earning profits and that crypto assets were invested in Liquidity Pools.

7. By November 2025, Goliath could no longer raise new investor money quickly enough to repay existing investors, it halted monthly distributions, and the scheme collapsed.

8. The JV Agreements that Defendants offered and sold to investors are, as described below, investment contracts and thus securities.

9. Defendants did not register any of the offers or sales of the JV Agreements with the Commission as no registration statement was in effect as to any offer or sale of the JV Agreements, and no exemption from registration

applied. Further, Delgado does not have any securities licenses and has never been registered with the Commission in any capacity, nor is he associated with a registered broker-dealer.

10.    By engaging in the conduct alleged in this Complaint, Defendants have violated, and unless enjoined, are reasonably likely to continue violating Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and additionally as to just Delgado, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## II.    DEFENDANTS

11.    **Goliath** is a Wyoming corporation formed in February 2019 under the name Gen-Z Venture Firm Inc. It changed its name to Goliath in September 2021 and maintained its principal place of business in Orlando, Florida. From approximately February 2019 through September 2022, Goliath operated as a consulting and marketing firm and was not involved in any crypto-related activities. Delgado then restructured the business to purportedly focus on investing in liquidity pools and crypto mining. Goliath remained a Florida corporation until September 3, 2025, when it filed Articles of Dissolution in Florida and, the same day, reincorporated in Wyoming under the same name.

4

12.     On March 3, 2026, a Florida Circuit Court granted a Goliath investor's *ex parte* motion to appoint a receiver (the "Receiver") over Goliath. *See Patel v. Goliath Ventures Inc.*, No. 26-003310 (Fla. 17th Cir. Ct. 2026). On March 16, 2026, the Receiver filed two voluntary Chapter 11 bankruptcy petitions for Goliath (for the Florida corporation and Wyoming corporation) in the United States Bankruptcy Court for the Southern District of Florida. *See In re Goliath Ventures Inc.*, No. 26-br-13174 (Bankr. S.D. Fla. Mar. 16, 2026); *In re Goliath Ventures Inc.*, No. 26-br-13176 (Bankr. S.D. Fla. Mar. 16, 2026) (jointly administered) (collectively "Voluntary Petition for Bankruptcy.")

13.     **Delgado**, 34, resides in Windermere, Florida. He is the sole owner, founder, and CEO of Goliath. During the Relevant Period, Delgado managed and controlled Goliath. The United States Attorney's Office for the Middle District of Florida ("USAO") filed a criminal complaint against Delgado on February 20, 2026, and then on June 23, 2026, filed an Information charging Delgado with one count each of conspiracy to commit wire fraud (18 U.S.C. § 1349), wire fraud (18 U.S.C. § 1343), and money laundering (18 U.S.C. § 1957). On June 30, 2026, Delgado pleaded guilty to all three counts contained in the Information.

### III.    JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and

Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

15.     This Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida because: (i) Goliath's principal place of business is in this District; (ii) Delgado resides in this District; (iii) there are investors who reside in this District; and (iv) a substantial part of Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the District. Further, Defendants have consented to this Court's jurisdiction.

16.     In connection with the conduct alleged in the Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and the mails.

## IV.     FACTUAL ALLEGATIONS

### A.     Goliath's Business and Securities Offerings

17.     Goliath claimed to be an international firm that "develops blockchain technology projects, operates and builds crypto liquidity pools, and manages Bitcoin mining infrastructure." During the Relevant Period, Defendants, and other entities and individuals working on their behalf—including a team of "Directors of Partner Services" (collectively, the "Directors")—raised at least $425 million

from more than 1,300 investors primarily residing in the United States, including in Orlando, Florida. As described below, the Directors functioned as sales agents who earned commissions for soliciting investors and managing their respective groups of investors on Goliath's behalf.

18.    Defendants sold securities in the form of JV Agreements that set forth the terms and conditions of the investment. According to the JV Agreements, (which had different versions) the purported minimum investment was $100,000, though investors could invest less. Investors would "partner" with Goliath to contribute Funds into Liquidity Pools managed by Goliath and operated on one or more decentralized trading platforms, such as Uniswap.

19.    The JV Agreements stated that Goliath and investors "will work together to decide which liquidity pools to engage in" and that all decisions relating to investing would be made "collectively." In fact, however, once investors transferred Funds to Goliath, they had no control over how their Funds were used or invested, nor any responsibility for identifying liquidity pools. Many investors were unaccredited and lacked the knowledge needed to assist with any purported decision making.

20.    The JV Agreements promised investors monthly profit distributions of 3% to 10% derived from trading fee revenue within the Liquidity Pools. Investors could receive distributions via bank wire or in crypto assets (typically

USD Coin ("USDC") or Ether ("ETH")) sent to their crypto wallets. Investors also could elect to compound their monthly distributions. The JV Agreements also guaranteed the return of investors' principal. Delgado, as Goliath's CEO, signed the JV Agreements.

21.    To invest, investors either wired money to a designated Goliath bank account or transferred crypto assets to one of Goliath's crypto wallets held at a crypto currency exchange. Investors transferred approximately $415.5 million to Goliath bank accounts, the majority via wire. From these accounts, at least $189 million was transferred to Goliath's crypto wallets. During the Relevant Period, investors sent at least $9.5 million in crypto assets, primarily USDC and ETH, directly to Goliath's crypto wallets.

22.    After entering into the JV Agreement and making an initial investment, investors were given access, through Delgado or a Director, to Goliath's online account portal, which purported to display real-time account activity, including balances, transactions, and distribution history.

23.    Delgado also hired individuals to help maintain Goliath's books and records, including preparing monthly financial reports that tracked bank and crypto wallet balances, wire transfers, investors account balances, new contributions, distribution amounts owed, and monthly commissions to the Directors. Delgado reviewed and approved these reports each month before

8

investor Funds were transferred from Goliath's bank accounts or crypto wallets to pay investor distributions and Director commissions.

24.     The JV Agreements are securities in the form of investment contracts under the Securities Act and Exchange Act. Investors invested Funds with Goliath to participate in one or more purported Liquidity Pools. Investors depended on Goliath and Delgado's efforts to oversee, manage, and control investments in the Liquidity Pools. Although the JV Agreements labeled investors as "Partners," they had no actual or legal authority to exercise entrepreneurial or managerial control. Defendants controlled all aspects of the so-called joint venture, including the deployment and oversight of Goliath's Liquidity Pools on decentralized trading platforms. Investors reasonably expected to profit from the efforts of others. Indeed, investors relied on Defendants' ongoing managerial efforts, rendering the investments passive and leaving investors with no responsibility for identifying, selecting, or managing any Liquidity Pool activity. Thus, the JV Agreements functioned as joint ventures in name only, lacking the essential elements of genuine partnership or shared control.

**B.     <u>Defendants' Solicitation of Investors</u>**

**1.     Directors' Role in the Offer and Sale of the JV Agreements**

25.     Beginning in at least January 2023, Defendants and their network of Directors solicited investors for Goliath's offering through personal referrals,

emails, Goliath's website and social media, meetings, conferences, and charitable sponsorships. Defendants deployed the Directors, who themselves were initially investors, to recruit additional investors.

26. Each Director managed a group of investors. They solicited and onboarded new investors, disseminated JV Agreements and marketing materials via emails to investors, and facilitated transfers of Funds between investors and Goliath. They were also responsible for: (i) tracking their investors' contributions and monthly distributions based on the promised profit rates; and (ii) working with Defendants to process monthly distributions and the transfers of investor Funds to Goliath for new investments.

27. Using investor Funds, Goliath paid Directors commissions based on the amount of investor capital each Director raised.

**2.      Delgado's Role in the Offer and Sale of the JV Agreements**

28. Delgado played an integral role in offering and selling the JV Agreements. During the Relevant Period, he personally solicited investors, provided them with marketing materials and JV Agreements, and countersigned the JV Agreements on Goliath's behalf.

29. Delgado also oversaw and managed the Directors, assisting them in soliciting investors through in-person meetings, phone calls, emails, conferences, and charitable events. He advised investors on the purported merits of the

10

investment, including the guaranteed return of principal and promised monthly profits of 3% to 10%. He also negotiated with certain investors on behalf of Goliath, agreeing to specific monthly distribution rates at the request of one or more Directors.

30.     As the face of Goliath, Delgado organized and attended business meetings, conferences, and charity events to project the purported success and profitability of Goliath's Liquidity Pool investment program.

31.     Each month, Delgado approved the purported profit distributions to be transferred from Goliath's bank accounts and crypto wallets to investors.

### C.     Defendants' Violations of the Antifraud Provisions of the Federal Securities Laws

#### 1.     Defendants Made Misstatements Concerning the Liquidity Pool Investments

32.     Defendants made numerous misstatements about Goliath's Liquidity Pool offering, including the use of investor Funds and Goliath's Liquidity Pools, the promised monthly profit distributions, and guaranteed return of principal. Defendants made these misrepresentations primarily in the JV Agreements and Goliath's marketing materials.

##### a.     Misrepresentations Regarding the Use of Investor Funds and Goliath's Liquidity Pools

33.     Defendants told investors that Goliath would invest their Funds in Liquidity Pools. In an investor presentation, Goliath claimed that it would invest

11

in "managed liquidity pool[s] that facilitate[] trading in the decentralized market." The JV Agreements likewise stated that Goliath and investors (defined as "Partners" in the JV Agreements) would contribute Funds to Liquidity Pools "on one or more trading platforms (such as Uniswap)" involving "the pairing of a combination of cryptocurrencies to exchanges" for which exchanges paid fees in lieu of interest. In essence, Defendants told investors they would earn a share of the fees generated when buyers and sellers used the Liquidity Pools to trade crypto assets.

34. Goliath's marketing materials likewise claimed that its Liquidity Pool strategy involved providing paired cryptocurrencies (such as USDC) in Liquidity Pools on one or more exchanges, allowing investors to generate passive income and maintain "sustainable participation in DeFi markets." The marketing materials stated, for example:

> (a) "Goliath is a joint venture private fund that invests in innovative blockchain and cryptocurrency projects around the globe";
>
> (b) "Liquidity pools, integral to decentralized exchanges (DEXs), form the foundation of Goliath's approach to generating passive income while improving market fluidity";
>
> (c) "Goliath deploys its liquidity pools on Uniswap, leveraging its Automated Market Maker (AMM) architecture and smart contract infrastructure for efficient and secure operations"; and

12

(d)     "[Liquidity Pool] Partners earn a share of transaction fees and potential liquidity rewards."

35.     Goliath also touted the "[b]enefits of investing in [its] managed liquidity pools," including "ongoing passive income," "limited price volatility," and "high market efficiency." Defendants disseminated to investors Goliath's "Liquidity Pool Strategy Whitepaper," which highlighted Goliath's purported managerial efforts and strategy. In this Whitepaper, Goliath, as part of its managerial efforts, claimed that it "facilitates participation in liquidity pools," "employs a multi-layered approach to risk management," uses mechanisms to "safeguard against significant drawdowns" while "managing exposure to market volatility," and provides "[c]omprehensive audits and ongoing security assessments" to ensure "operational integrity."

36.     Goliath's marketing materials illustrated its purported strategy by depicting how investor money would move from Goliath's bank account to its crypto currency exchange account to acquire USDC, then be transferred to an "encrypted ledger," and ultimately put into Liquidity Pools where returns would be generated from trading fee revenue:



37.    Defendants' representations about Goliath's investment opportunity, managerial efforts, and strategy were false. Goliath never sent any investor Funds to any Liquidity Pools, including Uniswap. Instead, Defendants used investor Funds to pay purported profit distributions to other investors, commissions to the Directors, and for personal use by Delgado.

### b.    Misrepresentations Regarding Profits

38.    Since at least January 2023, Defendants represented that investors would receive monthly profit distributions in either money or crypto assets starting the month after their initial investment. The JV Agreements stated that investors would receive monthly "profits" of 3% to 10% derived from the fees buyers and sellers paid to trade in the Liquidity Pools in which Goliath purportedly invested investor Funds.

14

39. These profit representations were false. Because Defendants never contributed any investor Funds to any Liquidity Pool, there were no profits to distribute, let alone profits of 3% to 10% per month. Instead, from at least January 2023 through October 2025, Defendants made all monthly distributions using investor Funds held in Goliath's bank accounts and crypto wallets. Defendants stopped distributions in November 2025 after they ran out of investor Funds to sustain their Ponzi scheme.

### c. Misrepresentations Regarding Guaranteed Return of Principal

40. The JV Agreements state that Goliath "guarantees the return of principal amount of capital deposited" by investors and that this "guarantee ensures that the principal amount shall be fully reimbursed, without diminution or impairment, regardless of the performance or outcome of the Joint Venture."

41. The JV Agreements explained that investors could withdraw all or part of their investment, and that Goliath would process withdrawals within 5 to 7 business days, subject to limited circumstances in which processing could be delayed up to 90 or 180 days, depending on the version of the JV Agreement.

42. Defendants, however, took no steps to ensure that Goliath could honor the guarantee. The promise of guaranteed return of principal was illusory because Defendants used investor Funds to make Ponzi interest payments to other investors, to pay commissions to Directors, and to finance Delgado's personal

15

expenses. And, after October 2025, Goliath suspended all payments to investors, including the return of principal due to insufficient funds.

### 2. Defendants' Fraudulent Scheme

43. Together with making the misrepresentations above, Defendants engaged in a fraudulent scheme to misappropriate investor Funds and deceive investors into believing their Funds were invested in Liquidity Pools and generating returns. Goliath received at least $425 million of investor Funds into its bank and crypto currency exchange accounts, or those affiliated with Goliath, all of which Delgado controlled.

### a. Misappropriation of Investor Funds

44. During the Relevant Period, Delgado misappropriated at least $51 million from Goliath's bank accounts, including approximately: (i) $17.5 million for real estate purchases, renovations, and related expenses; (ii) $4 million for luxury vehicles; (iii) $7.5 million for luxury retail purchases; (iv) $4 million on entertainment, including night clubs, restaurants, sporting events, and related travel; and (v) $2.9 million for a yacht. Delgado misappropriated this money by directing payments from one or more of Goliath's bank accounts. Delgado also withdrew or transferred approximately $13 million from Goliath's bank accounts, with the transfers going to accounts he personally controlled.

### b.    Misuse of Investor Funds

45.    During the Relevant Period, Defendants misused at least approximately $281 million of investor Funds, using them to make purported monthly profit distributions to investors using other investors' Funds.

46.    Defendants used investor Funds to pay commissions to the Directors who promoted Goliath's offering. These commissions incentivized Directors to recruit new investors into Goliath's non-existent business and keep the Ponzi scheme running.

47.    Defendants also misused approximately $53 million to maintain the façade that Goliath was a legitimate business investing in Liquidity Pools, thereby luring more investors. For example, Delgado spent more than $12.5 million on private flights and approximately $21.5 million on Goliath promotional events, holiday parties, and related travel expenses, including at a private members club in Orlando, Florida. Delgado used these lavish events, which investors attended, to promote the purported success of Goliath's business. He also spent approximately $3 million to acquire and renovate a luxury office space for Goliath and donated approximately $4 million of investor Funds to charitable organizations so that Goliath could promote its purported investment opportunity through sponsorships and convey an air of success. Delgado transferred

17

approximately $12 million of investor Funds from Goliath's accounts to pay credit card bills for both Goliath corporate credit cards and his own personal credit cards.

48.     Although Goliath's offering materials did not disclose whether investor Funds would be used to pay business expenses, none of these expenses were legitimate because Goliath operated as a complete sham and did not invest any investor Funds in Liquidity Pools.

### c.     Fictitious Account Activity and Performance

49.     Defendants provided investors access to an online account portal that purported to show real-time account activity, including account balances with purported increases in value over time and distribution payment history.

50.     The increasing account balances were false because investor Funds were never invested into Liquidity Pools. The distribution payouts were misleading because they were funded entirely with other investor Funds. Defendants also gave investors access to a dashboard displaying ledgers that purportedly showed the profitability of Goliath's investment in Liquidity Pools, including supposed crypto asset holdings, transaction history, crypto asset pairings, and crypto wallet addresses. In reality, the ledger was fake—Goliath never contributed investor Funds into any Liquidity Pool.

### 3.    Defendants' Scheme Falls Apart

51.    After Goliath failed to make monthly distributions in November 2025, Delgado sent three emails to investors providing the purported reasons for the delays.

52.    On November 17, 2025, Delgado sent an email stating that Goliath was undergoing a third-party audit which "serves as a powerful testament to the integrity and success of our liquidity provision strategies." He further stated that by "engaging top forensic experts, we are not only validating our day-to-day liquidity strategy but also providing irrefutable proof that your allocations are fueling genuine growth, free from any concerns." Delgado claimed that, due to this audit, Goliath needed to "temporarily halt operations," resulting in "slightly delayed" distribution payments, although he could not provide a timeline for payment.

53.    On December 3, 2025, Delgado emailed investors that "we're fully back to our regular rhythm, and the December 15-18 cycle will include everything owed to you, October catch-ups, November payouts and everything moving forward on the normal schedule." Delgado further misrepresented that the "delay was caused by additional compliance and forensic accounting requirements that had to be completed before we could release funds."

54.     On December 18, 2025, Delgado sent another email offering new explanations for the continued payment delays. He again falsely represented that the delay in November 2025 distributions "resulted from audit-driven recommendations to temporarily limit transaction volume while controls and reporting standards were finalized." Delgado also represented that: (i) the delay in December 2025 distributions "is administrative and related to coordinating traditional banking systems with blockchain-native operations"; (ii) the delays were "infrastructure-related and do not reflect liquidity constraints, performance issues, or operational insolvency"; (iii) Goliath was not dependent on new investor capital inflows to pay distributions; and (iv) "[i]institutional banking solutions are now established and scheduled to take place in January, which will restore consistency and reliability for distributions going forward."

55.     Each of these representations was false and part of Delgado's effort to lull investors and conceal Defendants' fraud. By November 2025, Goliath lacked sufficient funds to pay distributions required under the JV Agreements because Defendants never deployed investor Funds for investment in any Liquidity Pool. Instead, Defendants made Ponzi payments using investor Funds, and Delgado misappropriated investor Funds.

56.     On March 16, 2026, the court-appointed Receiver over Goliath filed the Voluntary Petition for Bankruptcy on its behalf.

20

## V.    CLAIMS FOR RELIEF

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

57.    The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

58.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by Goliath and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

59.    During the Relevant Period, Defendants directly or indirectly:

(a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

60.    By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
**(Against All Defendants)**

61.    The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

62.    By engaging in the conduct described herein, and as alleged in paragraphs 43-56 above, during the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

63.    By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Violations of Section 17(a)(2) of the Securities Act
### (Against All Defendants)

64.     The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

65.     By engaging in the conduct described herein, and as alleged in paragraphs 32-42 above, during the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT IV

### Violations of Section 17(a)(3) of the Securities Act
### (Against All Defendants)

67.     The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

68.　By engaging in the conduct described herein, and as alleged in paragraphs 43-56 above, during the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

69.　By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)
**(Against All Defendants)**

70.　The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

71.　By engaging in the conduct described herein, and as alleged in paragraphs 43-56 above, during the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

72.     By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

## COUNT VI

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
**(Against All Defendants)**

73.     The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

74.     By engaging in the conduct described herein, and as alleged in paragraphs 32-42 above, during the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     By reason of the foregoing, Defendants, directly or indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

## COUNT VII

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)
### (Against All Defendants)

76.    The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

77.    By engaging in the conduct described herein, and as alleged in paragraphs 43-56 above, during the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

78.    By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VIII

### Violations of Section 15(a)(1) of the Exchange Act
### (Against Delgado)

79.    The Commission repeats and realleges Paragraphs 1 through 56 of this Complaint.

26

80.    By engaging in the conduct described herein, and as alleged in paragraphs 17-31 above, during the Relevant Period, Delgado, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer nor associated with an entity registered with the Commission as a broker-dealer.

81.    By reason of the foregoing, Delgado, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## VI.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A. Permanent Injunctions

Issue permanent injunctions enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]; (ii) and further enjoining Delgado from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### B. <u>Conduct-Based Injunction</u>

Issue a conduct-based injunction that enjoins Delgado from:

(i) directly or indirectly, including, but not limited to, through any entity owned or controlled by him, from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Delgado from purchasing or selling securities for his own personal account; and

(ii) directly or indirectly, acting as or being associated with, any broker or dealer.

### C. <u>Disgorgement and Prejudgment Interest</u>

Issue an order directing Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint, pursuant to Sections 21(d)(3), (d)(5) and (d)(7) of the Exchange Act, [15 U.S.C. §§ 78(d)(3), (5) and (7)].

### D. <u>Civil Monetary Penalty</u>

Issue an Order directing Delgado to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

28

## E.  Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII. DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.


Dated: August 11, 2026          Respectfully submitted,

s/Alice Sum
Alice Sum, Esq.
Senior Trial Counsel
Florida Bar No. 354510
Direct Dial: (305) 416-6293
Email:  sumal@sec.gov
*Lead Counsel*

Jordan A. Cortez, Esq.
Senior Counsel
Special Bar No. A5502524
Direct Dial: (305) 982-6355
Email:  cortezjo@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300